**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

EXTENET SYSTEMS, INC.,

                             Plaintiff,                    **MEMORANDUM &**
                                                   **ORDER**
                                                   CV 19-7054 (GRB)(RLM)

            -against-

VILLAGE OF PLANDOME, PLANDOME
VILLAGE BOARD OF TRUSTEES,

                           Defendants.


----------------------------------------------------------------X

      The hoary institution of the legal profession is, as a consequence of its lengthy history, host to uncountable time-worn adages and aphorisms.  The arguments presented by defense counsel in this case irresistibly bring to mind one particularly favored by trial attorneys: "If you have the facts on your side, pound the facts; if you have the law on your side, pound the law; if you have neither the facts nor the law, pound the table."  *See, e.g.*, *United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996).  The parties bring cross-motions for summary judgment on the balance of plaintiff's claims regarding its application to install wireless facilities in the Village of Plandome, in which both defendants' motion brief and their brief in opposition to plaintiff's motion are rich in heated invective but poor in supporting facts or law.  Defendants' indignant tirade is particularly unbecoming given that, as detailed below, it was *plaintiff* who engaged in good faith in a particularly arduous and drawn-out application review process for *over a year*, only to have its application denied on mere pretense.  Accordingly, for the reasons set forth below, plaintiff's motion is GRANTED IN PART while defendants' motion is DENIED, such that plaintiff's request for injunctive relief is granted and the Village's Board of Trustees is instructed to grant plaintiff's

application and issue all necessary permits and authorizations for plaintiff to put its application into effect.

## I. Factual and Procedural History

The undisputed facts, as evidenced by the record provided, are set forth below.  Although in some cases the facts set forth are contested by one or both of the parties, in all such cases the respective party fails to provide any evidence in support of their position or cites evidence that fails to substantiate their claims.  Accordingly, disputed facts are only noted where the parties cite contradictory evidence from the record that clearly supports their mutually opposed positions.

ExteNet Systems, Inc. ("plaintiff" or "ExteNet") is a provider of communications infrastructure, specifically of (among other things) "distributed antenna systems (DAS) and small wireless facilities" which it builds for telecommunications providers like AT&T and Verizon.  DE 40-7 ¶¶ 1-2.  These small facilities, or "small cells," are a type of wireless technology that employ low power antennas to create a high-quality network and enable high-capacity wireless connectivity.  *Id.* ¶ 4.  Plaintiff is permitted to operate in New York under a Certificate of Public Convenience and Need ("CPCN") issued by the New York State Public Service Commission; among other provisions, this permit requires plaintiff to "obtain any required consents of municipal authorities before commencing construction of telephone lines" and to comply with all applicable laws and regulations.  *Id.* ¶ 3.  Small cells are defined by the FCC as facilities which, among other conditions:

> (i) Are mounted on structures 50 feet or less in height including their antennas as defined in § 1.1320(d); or
> (ii) Are mounted on structures no more than 10 percent taller than other adjacent structures; or
> (iii) Do not extend existing structures on which they are located to a height of more than 50 feet or by more than 10 percent, whichever is greater[.]

47 C.F.R. § 1.6002(l)(1).  Small cells can provide wireless service as little as 40 feet or as much as 600 feet away, depending on the nature of their physical surroundings.  *See* Administrative Record ("AR"), Docket Entry ("DE") 40-5, at 1106.  These antennas – generally attached to other structures, such as utility poles or buildings – are typically contrasted with macro cells or towers, which can be constructed either as much larger antennas installed on the roofs of large buildings or as freestanding towers typically over 100 feet tall, and can provide wireless service up to a mile or more away.  DE 40-7 ¶ 5.  Wireless networks – composed of, *inter alia*, these small cells and macro cells – reuse radio frequencies in providing service, and coordinate between the cells as a session (*e.g.*, a call or data transfer operation) moves between the areas covered by each respective cell.  *Id.* ¶ 8.  Small cells are often used to "fill in" gaps in network capacity between macro cells, which can relieve demand off of macro cells thereby improving the network's capacity and coverage.[1]  *See, e.g.*, *id.* ¶¶ 11-12; AR 625, 1102-03, 1112-13; DE 44-6 ¶ 5; DE 44-2 ¶ 12. Accordingly, installation of small cells has been driven by increasing consumer demand on wireless networks, which has diminished the capacity of the macro cell infrastructure built in the pre-smartphone era.  *See* AR 1094-97; DE 44-10 ¶¶ 35-36.

In 2016, plaintiff contracted with Verizon to construct a small cell system in the Village of Plandome (the "Village") and surrounding communities, with the intended goal of improving Verizon's 4G LTE network in the area.  *See* DE 40-7 ¶ 14; DE 41; AR 268, 1136-37.  As described by plaintiff's RF engineer, Christian Fridrich, such a process typically entails "Verizon com[ing] to [plaintiff] with a coverage deficiency in their network," and asking plaintiff to "design a

---

[1] As defined by plaintiff, "capacity" is how much traffic the network can sustain, while "coverage" is the size of the area where service is available.  *See* AR 1094-96.

network" that provides the desired signal strength over a given percent of the defined area.  *See* AR 1133-36; DE 44-6 ¶¶ 10-14.   In this case, Verizon determined that there were gaps in its network coverage in Plandome and certain surrounding areas, and provided coverage maps derived from its propagation model to plaintiff showcasing these gaps.[2]  *See* AR 268-69, 1034, 1111, 1174, 1587-93, 1826-27; DE 44-6 ¶¶ 10-14.   A copy of one of these maps, as shown by plaintiff in one of their presentations to the Village, is reproduced here:

---

[2] Plaintiff claims that these maps were "provided by Verizon Wireless" based on "its own coverage tool and network throughput data which included drive test data." AR 1583, 1826-27; *see also* AR 2329 (referencing a study conducted by local reporters, which – although admitted to have "many limitations" – confirmed that although "Verizon did test the best out of the three networks, there was not one [proposed small cell] node location that tested average [*i.e.*, -90 to -99 dBm] or higher" in its cell service, available at https://manhassetpress.com/testing-the-nodes/).   Verizon's conclusions as to the existence of a coverage gap were also confirmed by consultants hired by the Board.  *See id.* at 1167-68, 2853, 2855.  Nevertheless, defendants contest that either Verizon or plaintiff demonstrated any need for such coverage, claiming that plaintiff failed to provide "data concerning existing coverage and dropped calls and reception" (without a clear explanation as to why the maps, which seem fairly detailed, are not sufficient in this regard).  *See, e.g.*, DE 44-6 at ¶¶ 15, 37.  Yet defendants only cite to an accusation that plaintiff failed to "explain[] the source of the data" depicted, such as drive test data (*see* AR 1755) – which, in fact, plaintiff appears to have provided.  *See* AR 1826-27 (Fridrich explaining in June 2019 that "We actually provided updated documentation over the past month, further detailed information, actually showing the actual drive tests that Verizon did through the village").  The only evidence that defendants provide to suggest that there were no coverage gaps are images of maps taken from Verizon's website in June 2019 which stated that there was "excellent" 4G capacity at the proposed small cell sites in the Village. *See* AR 1756, 2955, 3519-26.  However, as plaintiff explained in a letter to the Board later that June, these maps are subject to the disclaimer that they "are not a guarantee of coverage and contain areas of no service, and are a general prediction of where rates apply based on our internal data."  *See id.* at 2050, 2083; *see also id.* at 1828-29 (Fridrich explaining that these maps are "a marketing thing" which "isn't linked to the true engineering propagation tool").  Defendants also contend that these maps were actually prepared by plaintiff, not Verizon, but as this does not appear to have any bearing on whether a coverage gap in fact existed, the issue appears to be immaterial.  *See* DE 42-1 ¶ 52.



AR 1592.   As indicated by this map, Plandome (seen in the center-left of the map) and its surrounding areas appear to experience significantly lower coverage levels (under Verizon's network) than other communities in the area.  *See* DE 44-6 at ¶¶ 12-14.  Accordingly, the contract called for the proposed network to improve service to a signal strength of -85 dBm or better for the AWS frequency band over 90% of a "polygon" covering the surrounding communities.[3]  *See* DE 41 at 22; DE 44-6 at 4 n.1; DE 44-8.  Given these goals, plaintiff designed a network which,

---

[3] Defendants cite a report from their expert finding that a July 2015 memo from Verizon reported that its nationwide standard for reliable 4G LTE wireless service was -105 dBm "for highway and rural settings" and -75 dBm "in high density or commercial and industrial type environments."  DE 40-3 at 4.  The expert concluded that a "coverage average of -90 dBm" would be "sufficient to provide Verizon with adequate service in the area."  *Id.*  Of course, this merely offers a snapshot: it's not clear how Verizon's standards may have changed by the time of plaintiff's contract a year later, let alone by the time of plaintiff's proposals in 2019.  Furthermore, an examination of the coverage map clearly shows that nearly all of Plandome experiences signal strength of less than even -90 dBm.  In any case, defendants' expert report was submitted in August of 2020, *id.* at 10, and there is no allegation that these arguments were raised before, much less considered by, the Village's Board of Trustees in evaluating plaintiff's application.

as set out in the contract, called for 66 small cell nodes to be installed in the polygon.  *See* DE 41; AR 1035.

Plaintiff then approached the Village with a proposal to install small cells in the spring of 2017, initially contemplating that twelve small cell nodes would be installed within the Village's boundaries.  DE 40-7 ¶¶ 25-26.  This proposal, as well as plaintiff's subsequent formal applications, was designed to primarily use existing poles or replacements of existing poles in public rights of way, but also entailed installing new poles where plaintiff determined that the former options were for some reason infeasible.  *See* DE 44-6 ¶ 15; AR 1124-28, 1732-34, 2847. In July 2017, the Village's Board of Trustees (the "Board"; together with the Village, "defendants")[4] adopted local law C-2017, which placed a 12-month moratorium on approval and construction of telecommunications facilities.  DE 40-7 ¶¶ 29-30.  Following an email to plaintiff from the Village clerk in December of 2017, plaintiff met with the Board in January of 2018.  *Id.* ¶¶ 33-34.  At this meeting, representatives from plaintiff, including its regional director for external relations, Richard Lambert, provided the Board with information on plaintiff's updated proposal for Plandome: now entailing installation of nine nodes, with two anticipated to be on existing poles, six on replacement poles, and one on a new pole (subject to meeting engineering requirements). *See* AR 3111-12.  Plaintiff's representatives also provided the coverage map reproduced above and a map of proposed node locations within the Village.  *Id.* at 3113-14.

In September of 2018, the Board adopted Local Law F-2018, enacting Chapter 152 of the Village Code.  *See* DE 40-7 ¶ 40; Chapter 152 – Telecommunications Facilities, Wireless (adopted

---

[4] The Board comprises five individuals, which at the time of the events detailed here included Mayor Minutillo, Deputy Mayor Herbert, and three Trustees (Bartels, Richardson, and Westfall).  *See, e.g.*, AR 2946; Incorporated Village of Plandome, *Village Officials* (2021), https://www.villageofplandome.org/village-officials.

Sept. 11, 2018), https://ecode360.com/34861940 ("Ch. 152").  Chapter 152, which is addressed to

Wireless Telecommunications Facilities, imposes various requirements on applicants like plaintiff,

including requiring an applicant to provide documentation that "demonstrates and proves the need

for the wireless telecommunications facility to provide service primarily and essentially within the

Village," and demonstrate that proposed facilities "will be sited so as to minimize visual intrusion

as much as possible."  Ch. 152-7(K)(2), 152-7(P); *see also* DE 40-7 ¶¶ 41-44.  In line with the goal

of "minimiz[ing] adverse aesthetic and visual impacts" in the area of the proposed facilities,

Chapter 152 sets forth a prioritization schedule of locations for such facilities, with "one being the

highest priority and four being the lowest priority":

> (1) On existing towers or other structures on Village-owned properties, including
> within the the [sic] Village right-of-way.
> (2) On existing towers or other structures on other property in the Village.
> (3) A new tower or any other structure on Village-owned properties, including the
> Village right-of-way.
> (4) A new tower or any other structure on properties in areas zoned for residential
> use.

Ch. 152-4, 152-8(A).  Although this ranking schedule does not explicitly contemplate the

replacement of existing poles with new poles, as proposed by plaintiff in its various applications,

a separate section of Chapter 152 establishes that "[a] replacement tower that is constructed on the

same site as an existing tower will be considered a co-location as long as the new tower is no taller

than the old tower . . . ."  Ch. 152-3.  Thus, under certain circumstances, installing a node on a

replacement pole would appear to be equivalent to using an existing pole under the 152-8(A)

matrix.  In any case, Chapter 152 requires an applicant to justify any node sited at a location below

the highest ranking, but even placing all structures at the highest-ranked locations does not

guarantee success, as an application may be rejected if the Board deems the site to "conflict with

the historic nature or character of a neighborhood."  *See* Ch. 152-8(B), 152-8(F); DE 40-7 ¶¶ 46-

47.  This raises certain problems for applicants, as Chapter 152 provides relatively little guidance as to the Board's or Village's aesthetic standards, at most providing that wireless facilities "shall not be artificially lighted or marked" and shall be "galvanized and/or painted . . . to harmonize with the surrounding environment."  *See* Ch. 152-11.  Indeed, the Village's counsel, John Ritter, explicitly stated that the Village's "local laws don't have specifics" as to aesthetics, which "gives us authority to take a look at that."  AR 1205.

Following the passage of Chapter 152, plaintiff submitted $27,000 in escrow payments as part of its application submitted in the fall of 2018.  *See* DE 40-7 ¶ 51.  Plaintiff and certain members of the Board (at least the Mayor and one trustee, and possibly others), as well as the consultant retained by the Village to review plaintiff's application, Richard Comi, went on site visits to the nine proposed node locations in October 2018.  *See* AR 59-60, 68-70.  Following this site visit, Comi sent a memo to plaintiff, noting that various alternatives and "better location[s]" were proposed for some of the nodes for plaintiff to consider.  *See id.* at 68-70.  Plaintiff subsequently added a tenth node to its application in November 2018.[5]  *See* DE 40-7 ¶ 54.  In a

---

[5] Defendants repeatedly contest whether plaintiff legitimately needed ten nodes to address the alleged coverage gap, claiming instead that that plaintiff refused to consider the feasibility of placing fewer nodes in the Village even if fewer nodes would achieve its goals, because its contract with Verizon established a set number of nodes.  *See, e.g.*, DE 40-7 ¶¶ 14, 20, 57, 167, 198; AR 2956.  Defendants' interpretation of the record is entirely inaccurate: astoundingly, defendants support this claim by directly excerpting the following quote from Lambert:

> [W]hen Chris Fridrich creates the design he – he doesn't start with any particular number. He's trying to fill those gaps. And 10 was the number that came up for how many nodes were required to fill the gap. So if you reduce to eight or some less number, you have gaps.

*See* DE 40-7 ¶ 167 (quoting AR 2814-15).  Here, Lambert clearly expressed that plaintiff *could not* achieve its service goals with fewer than ten nodes – not that it, for some reason, refused to consider fewer than ten nodes.  Furthermore, the record unambiguously establishes that plaintiff actively considered eliminating certain cells from its proposal, and its ultimate conclusion that ten nodes were, in fact, required to provide the contemplated service without gaps was confirmed by both sets of consultants retained by the Board.  *See, e.g.*, AR 1172, 1252-54, 2298, 2595, 2814-16, 2855-56, 2873-74.  Indeed, the fact that plaintiff went from twelve, to nine, to ten nodes in its successive proposals plainly contradicts the theory that it was somehow bound to place a predetermined number of nodes in the Village.

meeting held in December of 2018, the Board unanimously agreed to adopt a new fee schedule for wireless telecommunications applications (like plaintiff's) at the next Board meeting.  *Id.* ¶ 60.

After this meeting, plaintiff withdrew its application, then submitted a new application for ten small cells on February 7, 2019.  *Id.* ¶¶ 61-62.  In this latest application, plaintiff proposed installing two nodes on existing structures, five on replacement poles, and three on new poles,[6] of which all but one were proposed in public rights of way.  *See id.* ¶¶ 64-65; AR 243-47 (identifying the 10 nodes as Nodes 42, 44, 46, 47, 50, 51, 52, 53, 56, and 57).  Notably, as part of its application, plaintiff stated that it was submitting "$1,000 per new pole (3 total) and $100 per new collocation (7 total)."  *See* AR 243-47.  This letter clearly indicated that plaintiff understood the replacement poles to qualify as "co-locations" of existing poles – an understanding that the Board and its representatives failed to dispute.  Pursuant to the FCC's Declaratory Ruling and Third Report and Order, FCC 18-133, the Village was required to respond to the application by May 8, 2019.  *See* AR 440-41.  However, plaintiff and the Village entered into a tolling agreement on March 28, 2019, finding the application to be "complete" and extending the Village's time to respond to June 22, 2019.  *Id.*

The Board held a public hearing on the application May 13, 2019; Ritter led off the hearing by summarizing the background of the proposal, in which he advised the residents that the Board could not outright deny "the promulgation of these antenna systems," as the Village only had the discretion to regulate "location and the aesthetic quality of the installation."  DE 40-7 ¶ 67; AR 1085-89; *cf.* AR 1203.  Lambert and Fridrich then presented on the details of plaintiff's application

---

[6] The parties agree that the allocation was actually *six* on replacement poles and *two* on new poles; this conclusion is undermined by the explanation of the payment submitted by plaintiff, *i.e.*, that it was submitting "$1,000 per new pole (3 total) and $100 per new collocation (7 total)."  *See* AR 243-47.  The specific ratio of new poles and replacement poles at this juncture is not particularly crucial, however, given that this ratio shifted with successive accommodations made by plaintiff.

and addressed questions from the public.  DE 40-7 ¶¶ 68, 70-72; *see generally* AR 1092-1261.  In response to public comments, plaintiff's representatives asserted that they would consider proposed alternative locations for certain nodes.  *See* AR 1128-30, 1156-57, 1234-36.  However, Fridrich expressly noted the network was "designed to provide a certain service level on the street," such that the purpose of the nodes wasn't "to serve . . . houses," but instead "to serve the nearby streets."  *Id.* at 1125-26, 1181.  Thus, the nodes would ideally be placed on a right-of-way "on the road," as the "utility and the right-of-way is . . . [in part] a function of how close it needs to be to the road."  *Id.* at 1234-36; *see also* DE 44-10 ¶ 35(4).  Lambert also stated that plaintiff only built small cell technology and was not in the business of constructing macro cells.[7]  AR 1098, 1151-52; *see also* AR 3033.

A number of residents then raised concerns about the potential negative health effects from the RF emissions of the nodes.  *See* DE 40-7 ¶ 73; *see* AR 1208-10, 1221-23, 1227.  These concerns were apparently shared by some members of the Board: the Deputy Mayor responded to these comments by observing that "health concerns is the first thing we raised when this came to us awhile ago and it's a huge concern because I don't trust the government research as maybe some

---

[7] Defendants contend that plaintiff and Verizon failed to properly consider the option of installing a single macro cell as an alternative to constructing a small cell network.  *See, e.g.*, DE 40-7 ¶¶ 7, 10, 18, 19.  However, the record reflects that plaintiff addressed the option of macro cells on multiple occasions.  *See, e.g.*, AR at 1112-13 (Lambert noting that Verizon "would rather throw up a large macro tower because it's less expensive, but there are reasons why"); 1151-52 (Fridrich conceding that, by building a macro cell, "[t]here's a possibility that nodes could shift, some could be eliminated"); 1891-94 (Lambert stating that, "[i]f you want to get a macro up there, 200-foot tower with a very large power voltage on it, those are alternatives"); 2867-68 (Lambert stating that they "talked to Verizon" about a macro cell option, but "Verizon is sticking with their program right now").  Furthermore, the Village code seems to evince a preference for smaller constructions.  *See* Chapter 152-10 (requiring applicants to submit documentation "justifying the total height of any tower, facility and/or antenna requested").  Of course, the choice between small and macro cells was ultimately Verizon's to make, which is why they contracted with a company that exclusively builds small cell networks.  Whether Verizon properly considered a macro cell option is an open question, but it seems likely that they would have done so.  *See* AR 1202 (Fridrich stating, "I would be very surprised if Verizon hasn't approached someone in . . . Plandome at some point in the past about a macro.  Macros are far less expensive for the carriers than these small cell[s]"); 1942-43 (the Deputy Mayor stating, "That's the situation here.  We were approached over the years and we couldn't find a macro solution that was attractive to us.  So I've asked around a lot and the way the industry has developed it seems to be off the table"), 2912-14; *but see id.* at 1667-68; DE 40-3 at 2-3.

other people do," and although he conceded that there is not scientific data to "establish that it does present a health risk" and "[t]he research indicates that" the nodes were safe, he reassured the residents that "I can tell you we live here. We have the same concerns you have."  AR 1225-27. Residents also raised concerns about the aesthetics of the proposed poles, in one case noting that the pole proposed for Node 53 wouldn't fit because it would be in "an open area" unlike other poles that "have large trees and foliage" nearby, and would have to be right at the end of their driveway causing issues for vehicles; and in another case, claiming that the pole proposed for Node 46 "looks like a commercial light post" and "doesn't fit in with the feeling of the village."  *Id.* at 1153-54, 1162.  Otherwise, however, the comments as to aesthetics were fairly nonspecific.  *See, e.g.*, *id.* at 1229.  One resident also recommended that the Board seek to delay deciding the application for as long as possible, in the hopes of obtaining more leverage in its decision on plaintiff's application.  *See id.* at 1236-37.

Following the hearing, the Village issued an update to its residents, advising that it was investigating "whether there is an opportunity to reduce the number of nodes," and further noting that "local villages have not been successful in litigation and . . . denial based on health concerns is a non-starter."  *Id.* at 1285.  Shortly thereafter, Trustee Bartels emailed Lambert asking plaintiff to consider certain alternative locations for Nodes 42 and 46, which plaintiff agreed to examine; Bartels also conceded that health concerns "cannot be the basis" for denial of plaintiff's application.  *See id.* at 1293-94; DE 40-7 ¶ 79.  Plaintiff then submitted documents to the Board on May 24 and June 3, 2019, addressing questions posed by the Board and the public, including analysis of proposed alternative locations for Nodes 42, 46, 47, and 53.  *See* DE 40-7 ¶¶ 80-81.  Notably, the proposed alternative locations included sites *further down* the Chapter 152-8(A) ranking than those in plaintiff's original proposal.  *See, e.g.*, AR 1501-02.

11

The Board then held a second public hearing on June 10, 2019, at which Ritter reiterated that the Board was limited to examining "the aesthetics" and "the location" of the nodes.  *See* DE 40-7 ¶ 82; AR 1932-34.  At this hearing, Lambert presented once again, this time on plaintiff's activities since the May hearing in evaluating alternative sites proposed by the community; Lambert also proposed that plaintiff retain CityPole, a design firm that customizes designs of ornamental structures for housing small cells, to host a design charrette with community members to customize designs for plaintiff's proposed installations.  *See* DE 40-7 ¶ 83; AR 1947-48.  As before, Lambert and other representatives of plaintiff also responded to comments from the public.  *See generally* AR 1780-1976.  An attorney representing a group of residents also spoke at this hearing and submitted a supporting memorandum with exhibits.  DE 40-7 ¶ 85; *see* AR 1736-74, 3517-99.  These exhibits primarily include the maps retrieved from Verizon's website noted above (*see supra* note 2), as well as letters from various realtors as to the potential market effect of the proposed nodes on residents' homes and letters from various residents as to the aesthetic impact of the nodes.  *See* AR 3517-99.  Although defendants characterize the realtor letters as "highly detailed," these letters are, by and large, relatively formulaic.  On the one hand, some of the realtors attested to speaking with multiple decades of experience in the local market.  *See* AR 3528-38, 3580, 3583.  Yet despite this wealth of experience, none of the realtors' letters are longer than a single page, with all but one offering only one or two short paragraphs, and all are limited to conclusory statements asserting that the nodes would (a) decrease property value of nearby homes by anywhere from 10-30% and/or (b) negatively impact the marketability of such homes.  *See id.* (addressing Nodes 42, 46, 50, 52, 53, and 56).  Those realtors who addressed the impact of multiple nodes failed to address the possibility of any variance in effect among different nodes; indeed, some brokers used identical language in multiple letters addressing different nodes, while others

expressed concern about *any* "placement of cellular nodes around town in residential areas." *See id.* Moreover, the realtors offered little explanation or supporting evidence for these effects, other than assertions that "buyers are very conscious of any cells installed" and certain nodes were "aesthetically inappropriate for [their] proposed location." *Id.*

The residents' letters are generally more tailored to concerns about the aesthetic impact of the proposed nodes, specifically identifying Nodes 42, 46, and 51. *See* AR 3539-99. For example, various residents raised concerns that, *e.g.*, certain nodes "will be very close to where my children live and play," "will be visible from almost all aspects of our property," or "would tower over my driveway." *Id.* Similarly, others contemplated that they "will be forced to live with the tall pole and unsightly equipment of Node 42 in our constant and direct line of sight," or that they "will be staring at this node from our bedroom every morning," and "[t]he second we walk out of our house . . . we will see the institutional and very unsightly cell node," to the point that "[t]o even suggest something that tall, large and metal on our street is to show disrespect for the fabric of this street and this village more generally." *Id.* The residents go on at length, observing that "adding a pole and cell node equipment to this location would be in stark contrast to the carefully cultivated aesthetic of this tranquil area," as "there are no traffic lights or utility poles at this corner"; that "moving forward cannot mean installing a concrete and metal antenna that would look inappropriately large and ugly on any residential street; let alone one of the most classically beautiful streets on the North Shore of Long Island." *Id.* More generally, residents asserted that "[t]he size, design and construction proposed for Node 46, are all manifestly inappropriate for placement anywhere in the Village of Plandome," "we generally oppose the installation of cell nodes in Plandome," "[n]o part of the village should host a military style concrete and metal pole," and that "I am very opposed to any more poles, or objects added onto poles," adding a "request

13

that no nodes be installed at this time." *Id.*  In short, in the letters submitted before the June hearing, residents expressed unfiltered antagonism to the proposed nodes, typically raising concerns about those nodes that would be nearest to their individual home, but in many cases rejecting the proposition of wireless nodes being installed *anywhere* in the Village.  These concerns were echoed by residents at the June 10 hearing, to the point that many residents recommended denying the application in its entirety.  *See, e.g.*, AR 1934, 1949-50, 1952, 1957, 1965, 1967-68; DE 40-7 ¶ 93.  Curiously, when the Board was asked why it was working with plaintiff in proposing alternative locations rather than simply denying the application, Trustee Richardson replied that "we're trying to make a factual basis for denying."[8]  AR 1949-50.

At the hearing, Trustee Richardson also informed the residents that the Board would be retaining a new consultant to examine plaintiff's application to review (a) whether the application was flawed and (b) whether the data supporting the application was inadequate.  *See* AR 1837-39. This consultant, CityScape Consultants ("CityScape"), subsequently sent a letter to plaintiff on June 14, 2019, stating that the application "fail[ed] to address compliance with" a number of sections of the Village Code.  DE 40-7 ¶ 96; AR 2040-41.  This letter was, in certain ways, fairly ambiguous; for example, it noted that the application "fail[ed] to address compliance with, inter alia, the following sections of the Village Code," without explication of what else plaintiff may have failed to comply with; the letter then went on to note that "[i]n addition, there are a number if issues . . . that are site specific" again without further explication.  AR 2040-41.  Even some of the identified sections of the Village Code impose relatively discretionary or subjective

---

[8] Defendants attempt to qualify this statement by explaining that what Trustee Richardson "meant" by this was his subsequent statement that "The data would have to support the existence or the need for the nodes and the aesthetics comes later."  AR 1950.  At best, however, this appears to illustrate the contemplated grounds for denial – not to contradict the evident character of the trustee's statement, *i.e.*, suggesting that the Board was already predisposed to deny plaintiff's application.

requirements where deficiencies may have been difficult to identify.  *See* Ch. 152-7(P) (requiring facilities to "minimize visual intrusion" and "have the least adverse visual effect"); 152-7(R) (requiring facilities to "blend with the structure to which [they] may be affixed and/or to harmonize with the natural surroundings").  Nevertheless, plaintiff submitted a response – following a call with CityScape on June 18, which ostensibly clarified some of these concerns – on June 19, addressing each of the identified sections of the Village Code, including those directed to minimizing aesthetic impacts.  *See* AR 2048-57.  Of particular note, plaintiff observed that "[s]even of the ten nodes proposed will use existing utility poles within the right-of-way while one is proposed on a Village lattice tower on property owned by the Village," in contrast to the remaining two, which "are proposed on new utility poles." *Id.* at 2056.  Thus, once again, plaintiff conveyed its understanding – once again, at this point uncontested – that its replacement poles were equivalent to existing poles.  *Compare* AR 1730-35 (a June 10 letter from CityScape construing the replacement poles as new poles which was sent to the Board but, apparently, not conveyed to plaintiff) *with* AR 2040 (the letter sent to plaintiff on June 14, which merely asserted a failure to comply with Ch. 152-8(B) (which requires an explanation as to why a higher priority site was not selected) without any further explication).  Furthermore, the two new poles were both proposed at the specific recommendation of the Village, with one now being at a site "with few existing utility poles for attaching" where the only existing poles were "on private property on the sides of homes." *Id.* at 2056.

Plaintiff and the Village then executed a second tolling agreement on June 20, 2019, again extending the Village's time to act on the application, now setting a deadline of September 10, 2019.  *See* DE 40-7 ¶ 99.  On July 2, Village representatives – including three Board members – as well as a CityScape representative met with plaintiff to evaluate alternative locations for six

15

nodes.  *Id.* ¶ 100.  In anticipation of the meeting, plaintiff submitted a spreadsheet providing various details about the proposed nodes, including latitude and longitude coordinates.  *Id.* ¶ 102. In the days after the meeting, plaintiff submitted two updates to this spreadsheet, the first noting the alternatives addressed or proposed at the meeting, the second providing plaintiff's responses to the requests made at this meeting; the updated spreadsheet also stated that three nodes (47, 51, and 52) had been deemed acceptable by the Village.  *See id.* ¶¶ 103, 105-06; AR 2249, 2254, 2289, 2298.  In its responses, plaintiff noted that it was able to accommodate an alternative for all nodes discussed at the meeting save for Node 50.[9]  *See* AR 2295, 2298.

On July 17, Trustee Richardson emailed Lambert confirming the Board's interest in having a design meeting involving CityPole (the design firm Lambert referenced at the June hearing), Board members, and other Village residents (including the Village's Design Review Board) to review possible solutions for decorative poles.  DE 40-7 ¶ 113.  Plaintiff hosted this "design charrette" on July 30.  *Id.* ¶ 114.  Plaintiff then submitted supplemental materials to the Village, including their completed review of the alternatives and designs discussed at the July 2 meeting and the design charrette, on August 22.[10]  *Id.* ¶ 115.  Much like with its July submissions, with its latest materials, plaintiff stated that it was able to accommodate the Village's suggested alternatives for all nodes save for Node 50.[11]  *See* AR 2327-30, 2332-33.  Included with this

---

[9] Plaintiff had received an additional request to consider an alternative location (for Node 44) on July 11, which it also agreed to consider, and later agreed on July 25 that there was an existing pole at that location that they could "consider for replacement and hardening."  *See* DE 40-7 ¶¶ 108, 111.

[10] This submission may have (technically) been late, as the parties apparently agreed to a deadline of August 8 for plaintiff to submit "further revisions" to its application.  *See* AR 2355.  Plaintiff contests that this submission qualified as a "revision," instead describing it merely as responses to the Board's questions and proposals and noting that the application had been deemed "complete" back in March.  *See* AR 2361-62.  Ultimately, the issue is moot, as the parties subsequently agreed to yet another tolling agreement.

[11] Specifically, of the remaining nine nodes, three were deemed to be in acceptable locations from the outset (47, 51, and 52); plaintiff accommodated alternative locations for another five (42, 44, 46, 53, and 57); and plaintiff examined

submission was a further updated spreadsheet, as well as photo simulations of four different decorative pole designs for the proposed new pole installations (Nodes 42, 46, and 53). DE 40-7 ¶¶ 118-19; AR 2327-46.   CityScape responded on August 23, 2019, identifying various deficiencies in plaintiff's submission[12] and stating that, given these issues, "the Village can either (i) proceed to hearing and adjudication on the original application as submitted on September 9, 2019, or (ii) consider the revisions as submitted, timely notify all affected residents . . . and adjudicate the application at a special meeting to be scheduled in October 2019."   AR 2355. Plaintiff responded on August 27, 2019, asserting that they *had* provided all the allegedly missing materials, but that in the spirit of cooperation, they would agree to yet another tolling agreement, further extending the decision deadline to October 18, 2019.  DE 40-7 ¶ 123; *see also* AR 2361-62.  Two days later, CityScape replied, acknowledging that plaintiff "ha[d] provided the items we thought were missing in our August 23 letter regarding compliance with the Village Code," such that "[t]he sole remaining items are the design selection and finalized site plan/data sheets for each of the selected locations."  AR 2367.  CityScape also conveyed that the Village asked for Lambert to "go in and review with them . . . exactly where these new 'final' locations are and review the design options still on the table," and to provide "one final submittal with all nodes in their final location" with an attendant spreadsheet.  *Id.*

The next day, Lambert and Fridrich had a call with Trustees Bartels and Richardson to discuss the trustees' preferences for decorative poles and certain node locations.  *See* DE 40-7

---

whether two nodes could be eliminated entirely, ultimately determining that they could not (56 and 57).  *See* AR 2332-33.

[12] Specifically, CityScape noted that the latest proposal impacted new residents, all of whom would have to be notified; that the new locations for certain nodes had "no accompanying site plan"; that plaintiff failed to meet certain fairly clerical requirements under Chapter 152; and that the spreadsheet submitted was unclear in its description of distances from certain nodes to the nearest residential structures.  *See* AR 2355.

¶¶ 126-27.  Plaintiff continued to communicate with members of the Board, particularly Trustees Bartels and Richardson, about node locations and design options through the month of September, addressing, *inter alia*, alternative location proposals and designs for Nodes 42, 46, and 53.[13]  *See* AR 2376-77, 2385, 2632-35, 2646-47, 3482-96.  As with the previous exchanges, plaintiff again agreed to investigate all of the alternative locations proposed by the trustees, many of which they were ultimately able to accommodate.[14]  *See id*; *see also id.* at 2417-18.  Curiously, however, plaintiff recommended that Node 44 (which at that point was to be installed on an existing pole) be switched to a new midspan wood pole, as they were "confident that the current pole owner" would not permit them to attach to the existing pole – despite the fact that the owner was Verizon Telecom.  *Id.* at 3491.  No further explanation was given, but the Village offered no objection to this alternative.

The parties executed a third tolling agreement on September 9, 2019.  DE 40-7 ¶ 134.  In this agreement, the parties noted that the Village had "requested that ExteNet grant another extension of time for the Village to respond to consider materials submitted by ExteNet on August 23, 2019 in response to the Village's request for information," and they further agreed that "all requests for review of alternative locations and designs have been addressed" by plaintiff.  AR 2408-10.  The parties also scheduled a third public hearing for October 21.  Plaintiff then made another submission to the Village on September 19 based on the various discussions and meetings

---

[13] Crucially, Lambert noted to the Trustees on September 3 that the Fire Department easement proposed as a location for Node 53 "can no longer be considered, as the "Trustees have confirmed that the easement can only be used for ingress and egress of emergency vehicles," such that the previously accepted alternative in the Nassau County-owned sump lot was the "only remaining alternative."  AR 3485.

[14] Defendants contest that representations of this nature, as set forth in the spreadsheets drafted by plaintiff and submitted to the Board, do not "reflect any actual Village Board statement or vote" and that "[t]he wording there is ExteNet's."  *E.g.*, DE 40-7 ¶ 109.  While it is true that these assertions were drafted by plaintiff, defendants fail to provide any evidence that any members of the Board ever contested any of these representations, or, indeed, that any of these representations were false.

up to that point, including the latest rounds of emails.  *See* DE 40-7 ¶ 139; AR 2412-15.  This

submission once again included, *inter alia*, updated photo simulations for three of the nodes that

had new locations as well as an updated spreadsheet detailing the successive proposals and

responses regarding alternative locations, including each node's "Final Disposition."  DE 40-7

¶¶ 140-41.  CityScape responded on September 30, asking plaintiff to address several fairly clerical

issues, *e.g.*, inconsistencies in listed coordinates for certain nodes or photosimulations that

appeared to be not to scale.  *See* AR 2553-58.  Notably, however, CityScape also asserted that the

application failed to meet the location priority ranking set out in Chapter 152-8(A), claiming that

"only three (3) of the proposed nodes . . . meet the Town's highest siting priority" because the

remainder were either new poles or replacement poles – the first occasion on which plaintiff was

clearly advised that any of its proposed replacement poles were not considered equivalent to

existing poles.  *See id.* at 2554.

Plaintiff agreed to another tolling agreement on October 10, 2019 (which was ultimately

executed in early November), extending the Village's time to respond to plaintiff's application for

the fourth (and, ultimately, final) time to November 18, 2019.  *See* DE 40-7 ¶¶ 144, 155.  The

Board sent an email update to the Village's residents the same day, informing them that the public

hearing on the application would be adjourned to November 18.  *Id.* ¶ 145. Notably, in this email,

the Board went on to announce that "[s]ince the last Public Hearing on this application the Board

of Trustees has reviewed and evaluated the most optimal and aesthetic options," and that "members

of the Board have participated in meetings and calls with the Village Attorney, CityScape

Consultants LLC, City Pole, and ExteNet in preparation for the Public Hearing."  AR 2584.  On

October 17, plaintiff provided another supplemental submission to the Village, responding to the

issues raised in CityScape's letter of September 30 and including, as before, an updated

spreadsheet and photo simulations. *See id.* at 2585-2655. CityScape responded to this submission on October 24, pronouncing that "[a]ll of the matters requiring resolution have been addressed by the October 17, 2019 submittal, except for selection of color and design of poles for Nodes 42 and 46." *Id.* at 2660-61. CityScape's letter conveyed the Board's color and design preferences, apparently resolving this sole remaining matter, then went on to identify "one last issue and several conditions that need to be addressed prior to" the impending hearing. *Id.* These matters, however, merely entailed an additional request by the Board (to consider an alternative location for Node 42) and various conditions that would be imposed in the event the application was improved: *i.e.*, CityScape did not identify any deficiencies with plaintiff's application. *Id.* Plaintiff responded on October 25 confirming that it could relocate Node 42 as requested. DE 40-7 ¶ 153. Reflecting this exchange, the Board sent a further email update to the Village's residents on November 4, announcing that "Our wireless consultant CityScape Consultants, LLC have reviewed [ExteNet's] applications and have concluded that the applications are complete and ExteNet has addressed all issues raised by the Board of Trustees." AR 2709.

Nevertheless, members of the Board continued to submit additional requests to plaintiff to consider alternative locations for certain nodes, which plaintiff agreed to accommodate. For example, on October 31, Trustee Richardson – after having "discussed this with a few others on the [Board]" – had emailed Lambert proposing that, rather than install Node 51 on an existing structure, plaintiff should replace the existing structure and put up a new pole. *See id.* at 2685-86. Lambert confirmed on November 6 that plaintiff could comply with this proposal. *Id.* at 2740-42. Similarly, on November 7, Trustee Bartels asked Lambert about moving Node 53 from its then-proposed position, providing two alternative locations; once again, Lambert confirmed that

plaintiff could accommodate one of the alternatives (as identified by Bartels, the "better" but not "ideal" location). *Id.* at 3497-3502, 3513-16.

Prior to the November 18 hearing, plaintiff deferred consideration of Nodes 42 and 46 until January of 2020; the record does not clearly establish why this occurred, or at whose instigation. *See id.* at 2749, 2839-40, 2896. As a result, only eight nodes were up for review at the hearing: three on existing poles, three on replacement poles, and two on new poles (additionally, the two deferred nodes were both proposed to be installed on new poles). DE 40-7 ¶ 164; AR 2711, 2594-95. At the outset of the hearing, the Mayor made the following statement:

> The Board of Trustees has exercised the utmost care, concern and due diligence in the review of the 10 applications guided with the best interest of all property owners. We negotiated new tolling agreements for further review. We created a list of conditions to protect the community interest. The village engaged expert legal opinions from New York Conference of Mayors legal counsel, our village attorney, two consults with their attorney and met with special counsel.
>
> The Board of Trustees has listened to all resident objections during the public hearings and letters that were submitted via the clerk's office. All have been included in the file.

AR 2790-91. The "village's consultant and attorney" from CityScape, Anthony Lepore, echoed the Mayor's sentiments shortly thereafter, explaining to the residents that "at this juncture the application is complete and the applicant has addressed all of the items that we have identified as areas of deficiency throughout our review of the application as it has evolved." *Id.* at 2792-94; *see also id.* at 2911. Lepore went on to state that, under federal law and FCC regulations, municipalities retain only "the ability to consider locational issues and aesthetic issues in connection with the placement of small wireless facilities," that the Village "ha[d] established those guidelines in your regulations," and that "[t]he application was considered in accordance with those guidelines." *Id.* at 2794-95. As noted above, Lepore also confirmed that CityScape's engineers "examined the work [plaintiff] provided and confirmed the conclusions that [plaintiff]

21

drew" as to coverage gaps in the Village and that no fewer than 10 nodes were necessary to address these gaps. *Id.* at 2815-16, 2855-56. As at the prior hearings, Lambert and other representatives of plaintiff then presented on plaintiff's application and addressed comments from Village residents. *See generally* AR 2796-2928.

Despite the statements made by the Mayor and Lepore as to the Board's thorough review of plaintiff's application, the public comments at the hearing – like those at the prior hearings – were still universally against all of the proposed nodes.[15]  *See* DE 40-7 ¶ 171. Contrary to defendants' assertions, many of the comments seemed to be against not just the ten nodes proposed, but the prospect of installing any nodes at any time, under any conditions. *See, e.g.*, AR 2878 ("Clearly we're united in all the negative effects that this will have on our community. So I implore the board to deny this application in its entirety. Plandome residents will not suffer any hardship by the lack of these nodes."), 2920-21 ("It's not about the one or two – no disrespect to the people who have them near their homes. It's about the 10. . . . He said once you give up on those you've given up. This is not about one or two. This is yes or no, do you want to go down this path?"), 2923-24 ("I am concerned about all of the nodes. I'm not going to say I'm concerned about the ones that are near my house. I don't think we should have any of them, just for the record."), 2838, 2843-44, 2887-88, 2893.  Multiple residents suggested that the Board fight the application via litigation if necessary. *See, e.g.*, *id.* at 2834 ("[I]f there is a lawsuit you can raise my taxes and I will be a contributor to the legal fees."), 2919 ("I think really what the vote is, to

---

[15] See, for example, AR 2908 ("I don't think it's that one node. I think it's the 10 nodes that we're concerned about. . . . I think from what we've heard tonight that everyone is concerned. The node that's going up near Riley's house is going to affect his property values, just as it is on yours."), 2909 ("You can't choose to turn off that node that's 100 feet from your house. It will be on all the time, 24 hours a day, subjecting you and your family to wireless radiation."), 2911 ("So if the coordinates then are not acceptable to your residents, I hope you deny the application in its entirety."), 2902-04, 2915-16, 2919-21, 2923-25.

frame it tonight, I think we're going to end up in litigation. The question that you have to answer is whether you're going to end up in litigation with Verizon or with your neighbors."), 2925 ("I'm willing to put money into litigation if we get sued."), 2876-77, 2891-93, 2915-18.

Residents also voiced certain concerns regarding the aesthetic impact of the proposed nodes, most of which were fairly general in nature.  *See, e.g.*, *id.* at 2842 ("The 35-foot pole is 18 feet off the curb, which a 35-foot pole we will see, all of us. We're dog walkers. We're runners. We love our eagles. We love our hawks. We look at the sky. Thirty-five feet is huge."), 2859 ("[M]y primary concern is the incredible unique atmosphere of our community that I fear will be lost with the nodes that are planned."), 2861 ("So my primary concern is aesthetics. It really does not look attractive, particularly the pole that was shown on Parkwoods which is really obvious and unattractive. I think people coming into the village will really find it unattractive."), 2862-63 ("I don't feel like that part of this process [review of proposed construction by the Architectural Review Board] has come around. I don't feel like there's been an architectural rendering of what our community is going to look like after these nodes are in.").  Others expressed alarm about possible negative health effects.  *See, e.g.*, *id.* at 2825-27, 2845-47, 2862, 2888-91, 2909.

Certain Board members then spoke prior to voting.  Trustee Bartels stated that "I hear loud and clear, very loud and clear, the fact that residents don't want this. And I am inclined to honor that. . . . [L]et's go down with a bit of a fight."  AR 2932.  Bartels went on, promising that "[W]e're going to do our best to try to prevent this from happening. . . . [W]hat I'm hearing loud and clear is that you want us to – you want us to resist. And that's the direction that I propose to take."  AR 2934.  Trustee Richardson echoed these sentiments: "I underestimated the depth of emotion, even for these stupid little poles . . . . But I understand a lot of you are feeling the same way. I got that message tonight. And that's definitely going to affect my vote."  *Id.* at 2934-35.  Curiously, Deputy

Mayor Herbert appeared to discredit the testimony that had been offered as to the impact of the nodes on real estate values, noting that "with respect to the diminution in the value of homes . . . I didn't think the statements that were made were well founded."[16]  *Id.* at 2939.  He also conceded that potential health effects were "not a basis to oppose an application" and noted that articles he had read failed to conclusively indicate that wireless installations either were or were not harmful. *Id.* at 2938.  Nevertheless, the Deputy Mayor asserted that, "with respect to health . . . it's very much a concern of all of yours and certainly a concern of mine. It would be difficult for me to go forward with this."  *Id.*  The Board then unanimously voted to deny all eight nodes up for consideration.  *See* DE 40-7 ¶ 182.

The next day, the Board adopted a resolution affirming their denial.  *See id.* ¶ 183; AR 2952-56.  This resolution set out various findings, a few of which are of particular note.  Among other findings, the Board held:

- that it "specifically excluded from its consideration or reasoning for denial any . . . materials or information regarding any potential adverse health concerns or effect over radio frequency (RF) emissions."
- that "the FCC's most recent guidelines contain various pronouncements with respect to effective prohibition of wireless services and which purport to provide that providers are no longer required to establish a substantial gap in coverage," but held that "such guidelines are invalid, unlawful, and unconstitutional."  Nevertheless, the Board concluded that even if such guidelines "were deemed to fully apply," the denial would still be valid "due to the availability of alternate solutions, including, inter alia, a traditional 'macro' monopole . . .

---

[16] Defendants claim that, to the contrary, Deputy Mayor Herbert stated "[t]hat because of these nodes it would be impossible to sell, harder to sell at least."  *See* DE 40-7 ¶ 181.  Once again, it would be beyond charitable to describe defendants' construction of the record as "strained": even the most cursory review of the record makes clear that, by this statement, he was merely paraphrasing the comments made at the hearing which he explicitly found were not "well founded."  AR 2939.  Indeed, defendants regularly cite to pages in the record that directly contradict the claims they seek to make.  *See, e.g.*, DE 44-25 at 13 (arguing that "[t]here was ample evidence regarding ExteNet's refusal to generally consider placement outside of the right-of-way behind houses," yet citing to AR 2933, at which Trustee Bartels concedes that there would have been little opportunity to do so: "There are only a few places where the power lines [running behind houses] are accessible. . . . In many ways the optimal design for – if it were to happen is on existing poles. But we don't have that many existing poles.").  Yet defendants somehow found fit to question *plaintiff's* interpretation of the record, claiming that plaintiff's "version of the proceedings before the Village Board is so skewed as to make one wonder whether it is addressing the same Administrative Record as the one before this court."  DE 44-25 at 7.  It would appear that this question is more appropriately directed to the defendants.

and the alternative of locating the proposed facilities in private utility easements parallel to rear property lines."

- that the design examples that plaintiff provided "were better suited for urban and suburban land use areas not characteristically similar to the Village's single-family dwellings which are located along narrow local roads with no overhead electrical utilities inside the street rights-of-way."
- that plaintiff "did not adequately explore additional options for the placement of Node 53."
- that "[a]lthough ExteNet addressed the location priorities set forth in Section 152-8," the proposed nodes were by and large not at sites of highest priority under Ch. 152-8(A), and plaintiff "did not provide adequate information . . . as to the feasibility of utilization of other existing poles within the Village for its proposed nodes, such as the infrastructure contained in the existing utility easement areas."
- that, as a result of the foregoing findings, plaintiff failed "to show that its stated goals and objectives could not be met by other designs that would have lesser adverse aesthetic and visual impacts . . . as was demonstrated by the comments by ExteNet and residents in the November 18, 2019 public hearing."
- that "Verizon's website data and information reflects no substantial coverage gaps in respect of the proposed alternative locations," and that plaintiff similarly "failed to demonstrate how each of the nodes will specifically upgrade or improve wireless services, and failed to submit the type of data and information . . . reasonably required to establish a substantial coverage gap, or alternatively a reasonable upgrade or improvement in wireless services."
- that it found the realtors' and residents' letters described above to be "credible and persuasive" as to, respectively, the "substantial negative impact on local property values" and the "adverse aesthetic impacts" that the proposed nodes would entail," and, similarly, that it received public comment at the November hearing "regarding the deleterious effect that the selected locations and aesthetic designs would have on residents' viewsheds and property values."
- that plaintiff acknowledged "that no overall reduction in nodes can be made even if less overall or specific nodes would provide the same coverage."

AR 2952-56. The Board then held another public hearing on January 21, 2020 to review the application for Nodes 42 and 46. *See* DE 40-7 ¶ 200.

Once again, the public comments at the January 21 hearing were universally against all of the nodes, and many residents once again expressed opposition to the very concept of installing small cells. *See, e.g.*, AR 3031 ("[W]e don't want it in our backyard. I'm sure you wouldn't want it in yours."), 3034-35 ("[W]hy haven't you explored all these other sites before imposing these unsightly nodes that no one in our community wants?"), 3043-44 ("I object to the application based upon the fact that these 35-foot poles would be an aesthetic eyesore in the village and would

negatively affect property values."). Certain residents, as before, also expressed concerns regarding perceived health effects (*see, e.g.*, *id.* at 3018, 3022-33) and presented fairly general comments about aesthetic impacts (*see, e.g.*, *id.* at 3025, 3031-32, 3034-35, 3039, 3042-45). One resident again raised the threat that approving the application may "trigger[] resident litigation." *Id.* at 3042. The Board, once again, unanimously voted to deny the remaining portion of plaintiff's application as to Nodes 42 and 46. *See* DE 40-7 ¶ 203. The Board adopted findings the next day in support of this denial, adopting by reference the findings set forth in their November resolution. *Id.* at ¶¶ 204-05; AR 3049-50. The Board also made two additional findings:

- that its decision was "reinforced" by additional statements "received from the public" at the January 21 hearing "with respect to the adverse aesthetic and visual impacts of proposed Nodes 42 and 46" as well as "the adverse impacts on local property values[] and ExteNet's demonstrated failure to consider less intrusive alternatives."
- that, at the January 21 hearing, plaintiff admitted that it "did not genuinely consider one or more macrocell site alternatives," and that "upon further review and consider it may [have] be[en] feasible for ExteNet to achieve . . . [its] coverage objectives via less nodes," but plaintiff "was not prepared to further consider, amend or negotiate the final proposed locations, designs or configurations."

AR 3050.[17] Plaintiff filed this action on December 17, 2019, shortly after the November hearing. DE 1. After the conclusion of discovery, a pre-motion conference was held on the parties' contemplated cross-motions for summary judgment on October 26, 2020, at which the undersigned set forth a briefing schedule. DE 36. On January 5-6, 2021, the parties filed their fully briefed motions. DE 40-44.

---

[17] In plaintiff's Local Rule 56.1 statement, plaintiff asserts that this hearing "lasted approximately thirty minutes." DE 44-1 ¶ 203. Defendants deny this allegation, remarking that "the hearing lasted 37 minutes." DE 40-7 ¶ 203. Even setting aside the fact that it is difficult to understand how a period of 37 minutes would somehow not be encompassed by the phrase "approximately thirty minutes," the fact that defendants felt the need to contest this utterly trivial point is strange to the point of being actually concerning.

II. Discussion

*A. Summary Judgment Standard*

These motions for summary judgment are decided under the oft-repeated and well-understood standard for review for these matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211-12 (E.D.N.Y. 2015), *aff'd*, 643 F. App'x 54 (2d Cir. 2016), which discussion is incorporated by reference herein. In sum, the question before the Court is whether, based upon the undisputed or improperly disputed facts, either party is entitled to judgment in its favor.

Plaintiff alleges that defendants violated two sections of the Telecommunications Act of 1996 (the "TCA"). The TCA aims "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, PL 104-104, February 8, 1996, 110 Stat 56. Section 332(c) of the TCA "provides for FCC regulation of wireless telephone services" and "expressly preempts state and local rate regulation." *T-Mobile Ne. LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456 (S.D.N.Y. 2009). Nevertheless, the same section "preserves state and local zoning authority over the siting of wireless facilities." *Id.* That authority is subject to four limitations, two of which are at issue here, to wit: whether the Board's denials were "supported by substantial evidence contained in a written record," and whether defendants' actions "ha[d] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. §§ 332(c)(7)(B)(i) and (iii). Plaintiff also contends that Chapter 152 is preempted by the TCA either on its face or as applied to plaintiff's application.[18] In turn,

---

[18] Plaintiff also alleges that defendants' actions violated Section 253 of the TCA, which bars local statutes from "hav[ing] the effect of prohibiting the ability of any entity to provide interstate or intrastate telecommunications service" and from "manag[ing] the public rights-of-way" in any manner other than "on a competitively neutral and

defendants argue that plaintiff's preemption claims, its claim for violation of the TCA, and its claim for violation of the New York State Transportation Corporations Law are without merit and should be dismissed.  Each of these arguments is addressed in turn.

*B. Whether the Board's Denial Was Supported by Substantial Evidence*

Although federal courts have traditionally "taken an extremely deferential stance in reviewing local zoning decisions," "denials subject to the TCA are reviewed by this court more closely than standard local zoning decisions."  *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999) (citations omitted).  As the Second Circuit observed:

> In determining whether the denial was supported by substantial evidence, we must employ "the traditional standard used for judicial review of agency actions." This standard of review is deferential, and we may neither engage in our own fact-finding nor supplant the Town Board's reasonable determinations. Substantial evidence, in the usual context, has been construed to mean less than a preponderance, but more than a scintilla of evidence.

*Id.* at 494 (citations omitted).  The Second Circuit further observed that "the record should be viewed in its entirety, including evidence opposed to the Town's view," and that "local and state zoning laws govern the weight to be given the evidence."  *Id.*  The local law applicable here would, of course, be Chapter 152 of the Village Code.  This Court

> must "overturn the board's decision ... if it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [b]oard's view." If the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed.

nondiscriminatory basis."  47 U.S.C. §§ 253(a) and (c).  As plaintiff observes, the relevant provisions of these two sections are interpreted similarly.  *See* DE 44-22 at 17-18, 24-25.

*New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola*, No. 01-CV-8211(JS)(WDW), 2003 WL 25787525, at \*5 (E.D.N.Y. Mar. 26, 2003) (citations omitted) ("*New York SMSA (Mineola)*"). At their core, the findings set forth in the Board's November and January resolutions denying plaintiff's application addressed three broad concerns: first, plaintiff's alleged failure to sufficiently establish a coverage gap or other justification for its installations; second, plaintiff's alleged failure to minimize the aesthetic and financial impact of its proposed nodes; and third, plaintiff's alleged failure to consider alternatives to its proposal, including by installing fewer nodes, changing the location of the nodes, or installing a macro cell instead of the arrangement of small cells. Each of these justifications is addressed in turn.

### 1. Whether a Coverage Gap, or Other Basis for Installing Small Cells, Was Established

As noted above, the Board asserted in its November findings that "Verizon's website data and information reflects no substantial coverage gaps" for the proposed node locations. AR 2960. Similarly, the Board found that plaintiff "failed to demonstrate" how the proposed nodes would improve wireless services and "failed to submit" data ("e.g., detailed coverage and propagation maps with respect to each of the proposed nodes, drive test results, dropped-call data, or dropped-call records") that would establish a coverage gap. *Id.* This determination was not supported by substantial evidence.

"Wireless carriers are public utilities under New York law. . . . As a result, their application must be evaluated under the standard articulated by the Court of Appeals in *Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611 (1978)." *New York SMSA Ltd. P'ship v. Town of Oyster Bay*, No. 11-CV-3077 MKB, 2013 WL 4495183, at \*12 (E.D.N.Y. Aug. 16, 2013) ("*New York SMSA (Oyster Bay)*"). As (now chief) Judge Brodie observed:

"Under the *Consolidated Edison* 'public necessity' standard, a utility must show that (1) its new construction 'is a public necessity in that it is required to render safe and adequate service'; and (2) 'there are compelling reasons, economic or otherwise, which make it more feasible' to build a new facility than to use 'alternative sources of power such as may be provided by other facilities.'" In the context of a telecommunications company such as Plaintiff, this has been interpreted to mean that it must "demonstrate that there was a gap in cell service, and that building the proposed [facility] ... was more feasible than other options." Put another way, Plaintiff must prove three elements: "a coverage gap, that the [proposed] [f]acility would remedy the coverage gap, and that the [proposed] [f]acility would have a negligible impact on the community."

*Id.* (citations omitted). The relevant section of Chapter 152 requires that applicants submit

Documentation that demonstrates and proves the need for the wireless telecommunications facility to provide service primarily and essentially within the Village. Such documentation shall include propagation studies of the proposed site and all adjoining planned, proposed, in-service or existing sites that demonstrate a significant gap in coverage and/or if a capacity need, including an analysis of current and projected usage[.]

Ch. 152-7(K)(2).

The only evidence that defendants cite in support of the Board's findings as to coverage gaps are the maps displayed on Verizon's website, noted above. *See supra* note 2; DE 42-1 ¶ 59. As previously discussed, these maps expressed that Verizon's 4G coverage at the proposed node locations (as of June 2019) was "excellent." *See* AR 3519-26. Yet not only do these maps fail to provide any explanation for what "excellent" might mean (*e.g.*, in terms of dBm values), Verizon expressly cautioned that these maps "are not a guarantee of coverage and contain areas of no service, and are a general prediction of where rates apply based on our internal data." *See id.* at 2050, 2083. Plaintiff explicitly pointed out this disclaimer to the Board in its letter of June 19, 2019. *See id.* at 2050. They appear to have done so out of an abundance of caution: the issue of proving a "significant gap in coverage" as required under Chapter 152-7(K)(2) was not once brought up by the Board until the denial of plaintiff's application in November 2019. Furthermore, these website maps are overwhelmingly outweighed by the evidence in plaintiff's favor: the

coverage maps provided by plaintiff, the statements of plaintiff's RF engineer (Fridrich) at the hearings, the fact that plaintiff apparently provided further supporting documentation in June 2019 (*see supra* note 2 – an allegation challenged by defendants, but with no supporting evidence), and the fact that *both* consultants hired by defendants confirmed plaintiff's conclusions as to coverage needs.[19]   In comparison, the website maps barely amount to even a "scintilla" of evidence.   *See MetroPCS New York, LLC v. Vill. of E. Hills*, 764 F. Supp. 2d 441, 454–55 (E.D.N.Y. 2011) ("[A] finding which relies on . . . unsupported [evidence] to the exclusion of all other [evidence] is not based upon substantial evidence.").

Defendants also seek to undermine the evidence that plaintiff provided, *i.e.*, the coverage maps referenced above, contending that these maps are not credible: because the "green shading (confusingly designated as 'substandard') starts from mere blocks away from the existing macrocells – this renders any claim of substandard reception levels ridiculous on its face."   DE 44-25 at 9.   Yet they provide no evidence to support this assertion.   In effect, defendants ask the Court to conduct an engineering analysis of the coverage map itself, but the law neither requires nor permits such an exercise.   Similarly, defendants rely on plaintiff's alleged failure to provide "any supporting affidavit, certification, underlying data, data collection or analysis thereof."   *E.g.*, *id.* at 7, 10.   Yet plaintiff indisputably provided multiple coverage maps, which, as plaintiff explained, were created "from live drive-test data" and Verizon's propagation model (an explanation challenged by defendants, but again, with no supporting evidence).   AR 1826-27.

---

[19] The fact that both sets of consultants retained by the Board expressly confirmed plaintiff's findings as to a coverage gap is, to put it mildly, not helpful to defendants' argument.   Unsurprisingly, defendants attempt to qualify these confirmations, but they choose to do so by claiming that *both* sets of consultants were somehow "duped by ExteNet into thinking they had to accept its false and unsubstantiated claims of need."   DE 44-25 at 11.   To take defendants seriously on this point is to entertain an unsubstantiated caricature of plaintiff more befitting of a Disney villain than a, frankly, rather quotidian wireless service contractor.   It also raises the question of where, exactly, the Village continues to find these rubes, let alone why it keeps hiring them.

"To refute [plaintiff's evidence]," including Fridrich's testimony at the hearings, "the Board could have presented its own expert testimony or evidence. It did not. The Board also could have questioned [Fridrich's] credentials or the methodology used by [Fridrich] in arriving at [his] opinions. It did not." *New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trustees*, 812 F. Supp. 2d 143, 160 (E.D.N.Y. 2011) ("*New York SMSA (Floral Park)*"). Again, not once before the denial of plaintiff's application did the Board contend that plaintiff's application was deficient for failure to establish a coverage gap. The fact that the Board apparently would have preferred some other type of data indicating a coverage gap – defendants point to "dropped call" data, DE 44-25 at 11 – also does not provide a valid basis for denying plaintiff's application. As the court in *New York SMSA (Floral Park)* held:

> First, although the Code requires that a carrier demonstrate the existence of a coverage deficiency, the Code is silent as to what type of evidence is required. There being no affirmative obligation to submit statistical evidence of dropped or missed calls, the absence of such data cannot in and of itself impeach the credibility of Verizon's experts.

812 F. Supp. 2d 143 at 161 (concluding that "it was not reasonable for the Board to rely on the absence of a particular type of data that was not required to be produced," *id.* at 162); *see also Orange Cty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 84 F. Supp. 3d 274, 304–05 (S.D.N.Y.), *aff'd*, 632 F. App'x 1 (2d Cir. 2015) ("[N]othing in the Code or the TCA requires that Plaintiffs present data on dropped calls or customer dissatisfaction, and, accordingly, it is not, without more, an adequate basis on which to deny the Application."). Similarly here, Chapter 152 is silent as to "what type of evidence is required" to demonstrate the existence of a coverage deficiency, other than requiring "propagation studies" – which defendants do not claim that plaintiff failed to provide.

In sum, "other than the [evidence provided by plaintiff] which supports Plaintiff's representation that there is a gap," the Board here effectively "had no evidence before it to conclude otherwise." *New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *13 (collecting cases). "Thus, Plaintiff has demonstrated that it did have a service gap, and, therefore, the need for a facility to remedy the gap." *Id.* Accordingly, the Board's determination the plaintiff failed to establish a coverage gap is not supported by substantial evidence.[20]

### 2. Whether Plaintiff's Application Minimized Any Aesthetic and Financial Impact

The other two grounds for the denial both fall under the "negligible impact" element of the *Consolidated Edison* test. As noted above, the Board further asserted in its November findings that plaintiff provided designs "better suited for urban and suburban land use areas" than to "the Village's single-family dwellings" and that plaintiff failed "to show that its stated goals and objectives could not be met by other designs that would have lesser adverse aesthetic and visual impacts." AR 2954-55. The Board also held the realtors' and residents' letters submitted before the June hearing to be "credible and persuasive" as to the impact of the nodes on aesthetics and property values, and noted that it received further public comment at the November hearing to this effect. *Id.* at 2955-56. These determinations were also not supported by substantial evidence.

The relevant sections of Chapter 152 – at least, those that actually impose specific requirements for applications – require that applicants submit

> a demonstration that the facility will be sited so as to minimize visual intrusion as much as possible, given the facts and circumstances involved and will thereby have the least adverse visual effect on the environment and its character and on the residences in the area of the wireless telecommunications facility.

---

[20] There does not appear to be any dispute that plaintiff's proposed small cells would remedy this coverage gap, thus, the second element of the *Consolidated Edison* test is met.

Ch. 152-7(P), and that applicants

> maximize the use of building materials, colors and textures designed to blend with the structure to which it may be affixed and/or to harmonize with the natural surroundings, this shall include the utilization of stealth or concealment technology as may be required by the Village.

Ch. 152-7(R). Although it doesn't impose an affirmative obligation, section 152-8(F), asserting that the Village "may disapprove an application" for, *inter alia*, "[c]onflict with the historic nature or character of a neighborhood or historical district," is also relevant here.

Much of defendants' argument as to aesthetic impacts comprises impassioned commentary about the "unique bucolic landscape and character of the Village." DE 44-25 at 15. Much like with defendants' analysis of the coverage map, then, defendants also apparently seek for the Court to conduct its own aesthetic analysis of the proposed nodes and pole installations. *See, e.g.*, DE 40-7 ¶¶ 109 (claiming that the Board "was aware" that the proposed placement of Node 44 and the associated pole near the Plandome LIRR station was "aesthetically unacceptable," yet citing only to a photosimulation of the installation at AR 2613-14), 119; DE 42-1 ¶¶ 12-16 (providing a series of photosimulations defendants characterize as, *inter alia*, "visually disturbing"); DE 44-25 at 15-16. Once again, the suggestion is untenable.

Where defendants do cite to the record, they generally point to comments from residents, the lion's share of which are, as noted above, generic statements that failed to identify any issues that could be meaningfully addressed (other than by declining to install any nodes at all). To the extent that any comments did identify meaningful issues as to specific nodes, defendants almost exclusively cite to letters or comments taken from the hearings in May and June 2019. *See* DE 44-25 at 15-17; DE 42-1 ¶¶ 11, 17-35. Yet every node specifically identified by residents at those hearings – Nodes 42, 46, 51, and 53 – were subsequently either relocated and/or redesigned, all to

alternatives proposed by the Board.  The two exceptions are comments made at the November hearing, as to (a) Node 42, which was not even up for consideration at that hearing; and (b) Node 53, which is addressed further below.  Similarly, to the extent that these comments identified issues with the designs of the nodes generally, the Board itself selected the designs for many of the nodes from the set of designs put together at the design charrette.  *See, e.g.*, AR  2660.

To be sure, "aesthetics is a permissible ground for denial of a permit under the TCA." *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005) (citing *Cellular Tel. Co.*, 166 F.3d at 495).  Furthermore, residents' aesthetic objections – even when many comments "amount to no more than generalized hostility," like much of the residents' comments here – may serve as a basis for denial of a permit under the TCA.  *Id.* at 534.  In *White Plains*, the Second Circuit held that "the Board had discretion to rely (as it did) on aesthetic objections raised by neighbors who know the local terrain and the sightlines of their own homes." *Id.*; *but see Gonzalez v. Zoning Bd. of Appeals of Town of Putnam Valley*, 3 A.D.3d 496, 497–98 (N.Y. App. Div. 2d Dep't 2004) (holding that "[t]he generalized and unsubstantiated concerns of neighboring owners, upon which the Zoning Board based its determination, that the character of the neighborhood would be detrimentally changed if the petitioner's application for variances was granted, were unsupported by any empirical data or expert testimony and were insufficient to counter the evidence presented by the petitioner").  Of course, the situation in *White Plains* is clearly distinguishable, as there the court addressed a "150–foot tower [which] would rise to three times the height of the tallest evergreen tree and would be half again as tall as any other tree in the area." *White Plains*, 430 F.3d at 533.  In contrast, the Second Circuit has held that installations of antennas that "added less than eight feet to *existing* thirty-foot utility poles" amounted to merely a "*de minimus*" aesthetic intrusion.  *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, 552 F.

App'x 47, 50-51 (2d Cir. 2014).  Here, the proposed installations generally fall more on the *Crown Castle* side of the spectrum: many of the installations comprised antennas two feet tall and 14.6" in diameter, along with an equipment cabinet measuring about 3 feet tall (and in total a little under 3 cubic feet in volume).[21]  DE 40-7 ¶ 6.

Moreover, as noted above, every node which residents specifically identified in their comments about aesthetics prior to the November hearing were subsequently moved or altered – in compliance with proposals by the Board.  Residents at the November hearing only specifically identified aesthetic issues with two nodes, again as noted above; otherwise, all of the comments about aesthetics at the November hearing "were generalized and failed to identify specific aesthetic problems that the [proposed nodes] would create."  *T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 268 (E.D.N.Y. 2011); *see also Cellular Tel. Co.*, 166 F.3d at 496 (rejecting an aesthetics rationale for being based on resident comments that failed to "articulate specifically how the proposed cell sites would have an adverse aesthetic impact on the community").  This is hardly surprising, given that plaintiff appears to have addressed the concerns raised in the May and June hearings – including, for example, by going to the length of hosting a design charrette with an outside design contractor, an event in which members of the Village's Design Review Board participated.  In fact, the situation here – at least as of the November hearing – closely resembles that addressed in *Ramapo*:

---

[21] To be sure, as defendants note, a subset of the proposed nodes also required installation of new poles which would, of course, be substantially taller (*i.e.*, in the 25-35 foot range), or in some cases replacement of existing poles with a varying amount of additional height.  DE 40-7 ¶ 6.  Yet defendants fail to specify how much taller certain of the proposed replacement poles would be: at least one replacement pole (for Node 47) would still fit within the bounds approved of in *Crown Castle*.  *See* AR 1124-25 (noting that a 30-foot pole would be replaced by a 35-foot pole, with a 2-foot antenna on top); DE 42-1 ¶ 33.  Moreover, the Board rejected *all* of the proposed nodes – not just those on taller structures.  Accordingly, defendants' argument that the replacement poles were too high (*see, e.g.*, DE 44-25 at 15) fails to justify the Board's denial – and, given that defendants also complain about plaintiff's alleged failure to consider a macro cell structure that could easily be *one hundred feet* high, this argument reads as rather disingenuous.

> The record provides little support for the Planning Board's conclusion that T–Mobile's tower would be an "eyesore." Several town residents expressed concern about T–Mobile's plan during the application process, but the majority of the comments were either about health risks or grounded in general NIMBY feelings—the October 17, 2006 Planning Board meeting's minutes include the note that one person "does not want a tower in his back yard."

701 F. Supp. 2d at 461-62 (indeed, a resident here made exactly the same comment about her back yard. *See* AR 3031).  At the November hearing, "almost none of the [Plandome] residents who commented on the [nodes'] visual impact identified themselves as neighbors whose terrain and sightlines would be directly affected by" the proposed nodes.  *Ramapo*, 701 F. Supp. 2d at 462.  In sum, at the time of its decision on plaintiff's application, the Board was not faced with any meaningful comments regarding the aesthetic impact of the proposed nodes as they were then described in plaintiff's application.

The Board also addressed the nodes' potential impact on property values, which "can be considered by the Board and is a valid reason for the Board to deny an application for a use permit." *New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *16.  Yet here, "[t]he Board's ruling on property values is closely related to its determination on aesthetics, and stands on much the same footing." *White Plains*, 430 F.3d at 535.  As noted above, a number of local realtors, some with multiple decades of experience, submitted a collection of letters claiming that the installation of certain nodes would have a negative impact on neighboring homes' property values.  However, as the discussion of these letters above makes clear, these letters provide little more than conclusory assertions as to harm on market values (the various letters project an impact of anywhere from 10% to 30% of nearby homes' market value).  The Deputy Mayor also expressly discounted the representations made about impact on property values just before voting on plaintiff's application.  Once again, these circumstances are akin to those addressed in *Ramapo*:

Another person at that meeting, who claimed to be a real estate agent, asserted, apparently without support, that "a house located near a cell tower is a problem, with respect to market value." The only substantive evidence in the record to support this concern was a "letter of opinion" drafted by George Pinkham, a "certified appraiser," and filed with the Planning Board at the very end of the application process. That letter asserted that perceived health risks from a cell tower would lower property values for those living nearby. But it never actually conducted an appraisal of any properties located in Ramapo, and its information is based on a New Zealand study.

701 F. Supp. 2d at 462-63 (citations omitted); *see also Cellular Tel. Co.*, 166 F.3d at 496 (finding that "the volume and specificity of the comments were not adequate to satisfy the requirement of the substantial evidence standard").[22]  Even had the letters been more substantive, however, they merely address the impact of a subset of the nodes as they were located in June of 2019.  No updated letters were filed for the November hearing addressing the updated locations of these nodes, much less those that were unaddressed at the June hearing.  Moreover, much like the concern about proving a coverage gap, not once before the denial of plaintiff's application did the Board contend that plaintiff's application was deficient for undue (or, in fact, any) impact on property values.  Like the court in *Ramapo*, the undersigned here "sees evidence of generalized expressions of concern about aesthetics and property values—along with illegitimate expressions of concern about health hazards—but little more."  701 F. Supp. 2d at 463.  Accordingly, the Court concludes that the Board's findings as to the impact on both aesthetics and the real estate market were not supported by substantial evidence.

---

[22] Notably, plaintiff submitted a study examining the impact on property values of similar installations in the city of Rye, New York, which found "no significant difference between prices paid for properties with a direct view of these installations versus the average price of all 159 sales in Rye over the past year."  AR 1523-55; *see also id.* at 1561-78. While defendants accurately observe that this study was not addressed to Plandome, or even Nassau County, this study offers substantially more detailed insight than the realtors' letters.

### 3. Whether Plaintiff Failed to Adequately Consider Alternative Options and Locations

As noted above, the Board asserted in its November findings that plaintiff failed to consider alternatives including (a) reducing the number of nodes; (b) installing a macro cell instead of the small cell network; and (c) installing the nodes in different locations, such as "private utility easements parallel to rear property lines." The Board also specifically called out plaintiff's alleged failure to "adequately explore additional options for the placement of Node 53." These determinations were also not supported by substantial evidence.

As an initial matter, the issue of whether plaintiff adequately considered whether it could provide the same coverage with fewer nodes is fully canvassed above. *See supra* note 5. Yet again, not once before the denial of plaintiff's application did the Board contend that plaintiff's application was deficient for failure to consider installing fewer than ten nodes. The Board's finding on this ground is clearly not supported by substantial evidence.

Much the same can be said about whether plaintiff adequately considered (or, as defendants would have it, "*refused* to even *consider*," DE 44-25 at 14) installing a macro cell. *See supra* note 7. Significantly, plaintiff clearly established on multiple occasions that it did not construct macro cells and was not in the business of doing so. *See, e.g.*, AR 1098, 1151-52. Nevertheless, at defendants' request – and in apparent conflict with its own economic interest – plaintiff reached out to Verizon to inquire as to the possibility of installing a macro cell as an alternative to the proposed small cell network. *Id.* at 2867-68. Verizon apparently affirmed that it was sticking to the small cell plan. *Id.* This seems to be surprising, given that even plaintiff's own representatives testified that macro cells are typically more appealing to service providers like Verizon because they are "far less expensive." However, the rationale becomes a little clearer in light of Deputy Mayor Herbert's own statement acknowledging that the Village *had* been approached by service

providers regarding the installation of macro towers previously, and a solution couldn't be arranged.  *See id.* at 1943-44; *see also id.* at 2151-55 (a series of emails sent from a macro cell contractor, Elite Towers, to the Village from 2014 to 2019, which the Village failed to respond to until, surely only by coincidence, June of 2019).  Faulting plaintiff for failing to fully consider a network option which they were not in the business of constructing, when defendants ignored proposals for such a network for years prior to plaintiff's application, is, at best, a bit disingenuous.  *See also New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *18 ("A plaintiff need not evaluate every potential alternative in order to demonstrate that its proposal meets the least restrictive means test.").

In any case, defendants argue that "traditional zoning concerns over the availability of . . . feasible less-impactful alternatives is certainly a proper consideration on individual cases."  *See* DE 44-25 at 13.  To be sure, "[a] local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means."  *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).  Yet the Second Circuit in *Willoth* – a case which defendants rely on heavily for this proposition – observed that one of the "numerous ways to limit the aesthetic impact of a cell site" could be by "*reduc[ing] the tower height*."  *Id.* (emphasis added); *see also New York SMSA Ltd. P'Ship v. Town of Clarkstown*, 612 F.3d 97, 107 (2d Cir. 2010) (same).  Defendants' argument that a 100-foot macro cell would somehow be "less impactful" than ten small cells is, on its face, questionable; the fact that defendants present no evidence from the record to support this argument makes it absurd.[23]

---

[23] Indeed, when the Board actually met with a representative from Elite Towers in July 2019, the Board "expressed a concern about the visual impact of a tower of about 125 feet."  AR 2279.

Defendants also contend that plaintiff failed to consider alternative, ostensibly preferable, locations, particularly in "private utility easements parallel to rear property lines." Of course, Chapter 152 would seem to suggest that these are among the *lowest* priority locations for wireless facility placement. *See* Ch. 152-8(A) (ranking the placement of telecommunications facilities on private property lower than "on Village-owned properties, including within the Village right-of-way"). Of course, placement on existing structures is also noted to be of high priority, *see id.*, and indeed, defendants argue that "none of [plaintiff's] nodes (except Node 50, which was dependent on Node 57) met the criteria for highest priority inasmuch as they all required a new, taller utility pole." DE 44-25 at 12. Defendants miss the mark in their categorization. As plaintiff correctly summarizes, plaintiff's application

> included (a) small cells sited on existing or replacement poles in public rights of way (Nodes 47, 50, 52, 56, 57), (b) a small cell modified from the highest priority location to a lower priority at the specific request of the Village Board (Node 42), (c) small cells that the Village advised were acceptable and never asked for any changes to (Nodes 47 and 52), (d) small cells the Village Board itself selected the location, design, and color for (Nodes 42, 46, 53), and (e) a small cell where ExteNet had agreed, per the Village Board's request, to remove the existing lattice tower at the fire station and replace it with a more aesthetically pleasing pole on which the fire department's transmission equipment would be placed, all at ExteNet's substantial cost and expense (Node 51).

DE 44-22 at 14. Defendants clearly construe the replacement poles to not be equivalent to existing poles, yet at most cite evidence suggesting that only two replacement poles would fail to so qualify. *See* DE 42-1 ¶ 33. Even if all four replacement poles failed to qualify, however, this still leaves two nodes where *the Board itself* requested that the node be switched from an existing structure to a new structure (Nodes 42 and 51) and two others where, again, *the Board itself* selected the node's location. (Nodes 46 and 53). For defendants to turn around and claim that these locations were somehow deficient is disingenuous to the point of being hypocritical. As for the private utility easements specifically, "[o]ther than speculation that the alternatives were more appropriate and

41

Plaintiff should have tried harder, the Board presented no evidence that [the utility easements] were feasible or appropriate alternatives. The Board is required to support its decision with substantial evidence that the alternative sites were feasible." *New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *18. Indeed, Trustee Bartels admitted that doing so would have been difficult, given the paucity of poles and locations in the Village where that would have been an option. *See supra* note 16. To be sure, in CityScape's June letter to plaintiff, the Board communicated that plaintiff had failed to explain why certain nodes did not comply with the 152-8(A) priority ranking. But yet again, not once before the denial of plaintiff's application did the Board contend that plaintiff's application was deficient for failure to use utility poles on private property.[24]

Defendants' arguments as to Node 53 specifically fare no better. Defendants claim that plaintiff "did not consider placement of Node 53 behind a property owner's house, never contacted the property owner to ask if it could do so, and insisted that the Board vote on that Node without ExteNet investigating feasibility thereof." DE 44-25 at 13. It does not seem disputed that plaintiff did not contact the property owner in question. Everything else represented by defendants proves untrue. The location in question was the "ideal" location referred to by Trustee Bartels in his exchange with Lambert on November 7. *See* AR 3513. Plaintiff clearly "considered" this location in its response to Bartels' email, but to be sure, declined to place the node at this location. *See id.* Plaintiff had already communicated its reasons for declining to do so, however, in a *September* email to the trustees. The location at issue would have required access to a Fire Department easement on the property. *See* AR 2899-01, 2903. Yet Lambert noted to Trustees Richardson and

---

[24] In any case, it seems that plaintiff *did* consider using such utility poles. *See* AR 2056 (from plaintiff's June 19 letter to CityScape, explaining how using existing poles at a proposed site would not work because the site was "on "a section of Woodedge Road with few existing utility poles for attaching" where the only existing poles "[were] on private property on the sides of homes" and transformers were currently on those poles, so plaintiff was "unable to attach to these poles per PSE&G regulations").

Bartels in an email on September 3, 2019 that "[t]he Fire Department easement can no longer be considered. Trustees have confirmed that the easement can only be used for ingress and egress of emergency vehicles." AR 3485. Even with that having been established, at the hearing, plaintiff offered to "condition approval" for Node 53 based on a good faith attempt to obtain access to this easement, agreeing that under such a condition, "we couldn't even proceed with the proposed location as it exists now until we satisfy that condition of approval. So the condition would be we have to investigate whether this alternative location, whether we can use the easement. If all of that is feasible it's going there." AR 2900, 2903, 2906-07; *see also* DE 40-7 ¶ 193.

The record clearly reflects that plaintiff engaged in a colloquy with both residents and the Board over a number of months, testing the feasibility of proposed sites and reporting back to the Board with results – often adopting the Board's proposals. "When examined as a whole, it is clear [plaintiff] made a good faith effort to investigate alternative sites. The Board offers no evidence to support their findings of fact, they instead chose to attack [plaintiff's] methods as insufficient to show good faith." *New York SMSA (Mineola)*, 2003 WL 25787525 (citations omitted). This is so even though "[a] plaintiff need not evaluate every potential alternative in order to demonstrate that its proposal meets the least restrictive means test." *New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *18. In sum, the Board's determination that plaintiff failed to adequately consider alternatives is not supported by substantial evidence.

None of the Board's findings are supported by substantial evidence. In fact, a number of issues identified in the two resolutions denying plaintiff's application had *never once* been identified as issues by the Board or by CityScape in their communications with plaintiff. While this latter point isn't necessarily dispositive, as ordinarily a municipality may base its findings on

the entire administrative record, this case is obviously distinguishable from the ordinary course of events given the Board's constant communications with plaintiff where it *did* identify issues – and then noted when those issues had been resolved. Thus, plaintiff "has met its burden by demonstrating a gap in service, that the proposed facilit[ies] would remedy the gap, and that the proposed facilit[ies] would have minimal impact on the community." *New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *20.

To some extent all of the above analysis is redundant, however, because the Board *explicitly* noted, *multiple times*, that plaintiff had addressed the items that they had identified as deficiencies. *See* AR 2709 (Nov. 4 email from the Board to residents asserting that CityScape had concluded that plaintiff "has addressed all issues raised by the Board of Trustees"); AR 2660-61 (Oct. 24 letter from CityScape to plaintiff, asserting the same); AR 2792-94, 2911 (CityScape's representative stating the same at the November hearing).[25] The comments made at the November

---

[25] Once again, defendants try to undermine their own retained consultants to try to avoid the consequences of the consultants' statements. Specifically, defendants claim that CityScape's reviews "did not purport to address the actual full merits of the application" and "did not purport to usurp the public hearing process or the Village Board's authority." *See* DE 40-7 ¶¶ 142, 150; *see also* DE 44-25 at 9. To be sure, the decision was ultimately the Board's. But this disclaimer is merely the tip of the iceberg in an overall effort of defendants to disclaim any responsibility for any events prior to the November hearing. For example, defendants repeatedly insist that the Board only "acts as a body based on the entire record before it," such that "individual requests or statements of a Board member are not binding on the Board as a whole." *See, e.g.*, DE 40-7 ¶¶ 53, 56, 116, 176, 179; DE 44-25 at 9. Defendants also deny "any suggestion that the Boardmembers' statements reflected their full reasoning and understanding" – even statements made *immediately before* voting on plaintiff's application. DE 40-7 ¶¶ 176, 179; *see also* DE 44-25 at 9. Similarly, defendants portray many of the individual Board members' communications with plaintiff to merely be "conscientiously and fairly explor[ing] potential solutions before the impending public hearing where the locations would be subject to public review[.]" DE 40-7 at ¶¶ 128-29, 131, 137-38, 157, 160. This latter element appears to be a theme. *See, e.g.*, *id.* ¶¶ 139 (emphasizing that the tolling agreements stated that a public hearing would be held), 156 (same), 190 (admitting that plaintiff agreed to move Node 53 multiple times, including as late as early November, "except [to] point out that this was prior to the November 2019 hearing, during which [plaintiff] insisted . . . that an alternative location [previously deemed to be unworkable] merely be an alternative"). These arguments, taken as a whole, seem to be meant to suggest that the Board's decision hinged only on the November hearing, such that *nothing the Board did prior to the hearing mattered*: that the months of back and forth, constant adjustments and negotiations between the parties, the presentations before the public, the investigations and compromises and accommodations made by plaintiff – let alone the affirmative statements of approval issued by both the Board and its consultant – had no implications or effect on plaintiff's application whatsoever. That, in effect, the entire process was a costly farce, a pretense, even an outright hoax. Defendants now seek the Court's approval of this skullduggery. To say that this demonstrates a remarkable lack of perspective would be a gross understatement.

hearing, to the extent they offered anything more than general opposition, were largely addressed to generic concerns about aesthetics or health – messages the Board had heard at prior hearings, and in any event not proper bases for any denial.  Thus, nothing at the hearing could have changed any reasoning underlying the wholesale approvals announced mere days beforehand.  Accordingly, these statements *alone* appear to demonstrate that the Board's denials were mere pretense and therefore not supported by substantial evidence.  That is, the sudden reversal of the Board from a position held mere days prior to the hearing strongly suggests that the reasons set forth in the resolution were merely a conceit, issued to cover the fact that the Board's true concern was "generalized objections and concerns 'which, in effect, amount to community pressure.'" *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 558 (S.D.N.Y. 2009) (citation omitted).  This theory is only bolstered by the fact that two members of the Board – incredibly, the two arguably *most involved* in the application process, the members who had worked regularly with plaintiff on revising the application to comply with requests from the Board – voiced that the views of the residents as expressed at the November hearing would dictate their vote.  As plaintiff aptly summarizes, "[t]he denial was about keeping small cells out of the Village, nothing else."  DE 44-22 at 14.

The fact that defendants chose not only to defend this action through the summary judgment stage, but to seek judgment *in their favor*, with the full knowledge of the statements from CityScape *and the Board itself* that conclusively resolve the case in favor of plaintiff, borders upon frivolity.  To do so while accusing plaintiff of, *inter alia*, arguing based on "cherry-picked portions, mischaracterizations, and omissions" of the record, DE 44-25 at 3, is nothing short of hypocritical.  The fact that doing so imposed a significant tax on the parties' and the Court's resources – particularly in light of the massive size of the record to be reviewed in this case, which amounted

to over *three thousand* pages – demonstrates a wanton disregard for the ideal of achieving "the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

Accordingly, plaintiff's request for injunctive relief is granted, and the Board is instructed to grant plaintiff's application and issue all necessary permits and authorizations for plaintiff to put its application into effect.  *See New York SMSA (Oyster Bay)*, 2013 WL 4495183, at *20 (collecting cases issuing similar injunctions).

## C. Plaintiff's Remaining Claims

The factual record set forth above makes it abundantly clear that plaintiff has presented a serious question as to whether defendants' actions constituted an "effective prohibition" of personal wireless services.  *See, e.g.*, *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (holding that "in determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, [the FCC] 'consider[s] whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment'").  However, because the relief requested by plaintiff on its "effective prohibition" and discrimination claims are identical to that requested for the "substantial evidence" claim, it is unnecessary for the Court to address these claims on the merits.  The same conclusion applies to plaintiff's New York State Transportation Corporations Law claim.

Furthermore, because this determination effectively secures the substance of the relief sought by plaintiff, the Court finds it similarly unnecessary to address plaintiff's preemption claims.  Nevertheless, once again, the record clearly presents a serious question as to whether the provisions of Chapter 152 challenged by plaintiff are in violation of the TCA.  *See, e.g.*, *TCG*, 305

46

F.3d at 81 (preempting local provision allowing a town council "to consider any factor deemed to be in the public interest" because it "provide[d] precisely the sort of discretion to prohibit telecommunications services that § 253 preempts"); *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 603 F. Supp. 2d 715, 733 (S.D.N.Y. 2009), *aff'd*, 612 F.3d 97 (2d Cir. 2010) (noting that the Second Circuit in *TCG* "seemed particularly troubled by the combination of the city's discretionary authority and its 'extensive delays' in processing the provider's franchise applications"); *see also* 47 U.S.C. § 332(c)(7)(B)(i) (prohibiting local laws from "discriminat[ing] among providers of functionally equivalent services") *and* DE 40-7 ¶ 17 (defendants apparently conceding that "[r]esidential wifi"/"WiFi hotspots" provide comparable wireless coverage to macro cells and small cells, even though sections 152-6(C) and (D) exempt these technologies from the requirements of Chapter 152).

### III. Conclusion

Based on the foregoing, it is hereby Ordered that plaintiff's motion for injunctive relief is GRANTED, and defendants are directed to grant plaintiff's application and issue all necessary permits and authorizations for plaintiff to put its application into effect.  The Clerk is directed to enter judgment as set forth above and to close the case.

Dated: Central Islip, New York
        September 29, 2021

        /s/ Gary R. Brown_____
        Gary R. Brown
        United States District Judge